UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WILLIAM WASHINGTON, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | |
| | § | |
| MARSHA MCLANE, JESSICA MARSH, | § | A-21-CV-521-RP |
| AMANDA BELTRAN, RACHEL | § | |
| KINGSTON, JAMES WINCKLER, and | § | |
| MICHAEL ARENIVAZ, | § | |
| DEFENDANTS. | § | |

## ORDER

Before the Court are Plaintiff William Washington's Complaint (ECF No. 1), Defendants Marsha McLane, Jessica Marsh, Amanda Beltran, and Rachel Kingston's Motion for Judgment on the Pleadings, which the Court converted to a Motion for Summary Judgment, and their supplemental pleadings (ECF Nos. 28, 54, 60), Defendants James Winckler and Michael Arenivaz's Motion for Summary Judgment and supplemental pleadings (ECF Nos. 40, 61), and Washington's Arguments and Competent Summary Judgment Evidence (ECF No. 65). Washington has also filed a Motion for Disclosure. (ECF No. 59.) Upon review of the parties' arguments and the record, the Defendants' Motions for Summary Judgment are granted and Washington's Motion for Disclosure is denied.

## I. Statement of the Case

In 2011, a jury found Washington to be a Sexually Violent Predator (SVP) and the trial court entered an order of civil commitment. *See In re Commitment of Washington*, No. 11-05-05226-CV (435th Dist. Ct., Montgomery Cnty, Oct. 5, 2011). Washington is currently under the

1

custody of the Texas Civil Commitment Office (TCCO) and resides at the Texas Civil Commitment Center (TCCC) in Littlefield, Texas.

In June 2021, Washington filed a federal complaint, naming as defendants Marsha McLane, TCCO Executive Director; Jessica Marsh, TCCO Deputy Director; Amanda Beltran, TCCO Case Manager; Rachel Kingston, TCCO Case Manager; James Winckler, Management Training Corporation (MTC) Chief of Security; and Michael Arenivaz, MTC Security Officer. Washington claims TCCO Policies 3.12 ("Client Marriages Policy") and 3.29 ("Healthy Relationships Policy") (together, "TCCO policies") violate the Fourteenth Amendment's Equal Protection and Due Process Clauses because they prohibit TCCC residents from marrying other residents; specifically, the TCCO policies prevent Washington and TCCC resident Bryan "Katie" Layton from marrying one another. Washington also claims the TCCO policies unconstitutionally infringe upon TCCC residents' freedom of expression, speech, and intimate association. Washington finally claims Defendants Winckler and Arenivaz engaged in retaliatory harassment based on his romantic relationship with Layton by having Washington fired from a job, prohibiting him from receiving a package worth $557.00, confiscating his Black Lives Matter t-shirt and legal research, not allowing him to wear pink, and placing Washington on a thirty-day dorm restriction and six-month package restriction. Washington seeks injunctive relief enjoining TCCO from enforcing the Client Marriages and Healthy Relationships Policies and a declaratory judgment against TCCO's ban on TCCC residents' relationships and their ability to marry one another. (ECF No. 1.)[1]

---

[1] Washington's complaint is replete with allegations and claims that the TCCO policies discriminate against homosexual SVPs and thus "deny homosexual/transgender couples the right to marry, and in doing so, demean their dignity for no legitimate reason." (ECF No. 1 at 6.) In his later pleadings, Washington repeatedly states he is not raising claims based on sexual orientation or gender discrimination; further, in his supplemental summary judgment brief, Washington states he "wishes to make clear that this is NOT a case about sexual orientation, but rather about the right to marry whom 'we' choose regardless of sexual orientation." (ECF No. 65 at 3.) Accordingly, the Court

In response, Defendants McLane, Marsh, Beltran, and Kingston ("TCCO Defendants") filed a Motion for Judgment on the Pleadings; the Court converted it to a Motion for Summary Judgment and ordered the defendants to provide further briefing pursuant to *Turner v. Safley*, 482 U.S. 78, 84 (1987). (ECF Nos. 28, 54.) In their supplemental summary judgment pleadings, the TCCO Defendants argue there is a rational relationship between the TCCO policies and the State's legitimate interest in the long-term supervision and treatment of SVPs; there is no available alternative for Washington to exercise his right to marry Layton; allowing SVPs to marry one another would greatly impact other TCCC residents as well as guards and facility resources; and there is no easy or obvious alternative to accommodate the marriage of two civilly-committed SVPs. (ECF No. 60.)

Defendants Winckler and Arenivaz ("MTC Defendants") join and adopt the arguments and evidence from the TCCO Defendants' supplemental summary judgment pleadings and add that allowing TCC residents to be in relationships and/or marry one another would be disruptive to TCCC security and burden facility resources and staffing. Regarding Washington's claim that the MTC Defendants retaliated against Washington when he exercised his constitutional rights, the MTC Defendants argue they were enforcing TCCO policy, not harassing or retaliating against Washington, and that Washington has failed to state a claim for a First Amendment violation or for retaliation. (ECF Nos. 40, 61.)

Washington has filed responses in opposition to the TCCO Defendants' and MTC Defendants' motions (ECF Nos. 37, 43, 49, 51), as well as supplemental summary judgment pleadings and evidence, where he argues the TCCO polices violate his constitutional rights

---

concludes Washington has intentionally abandoned any claims based on gender or sexual orientation discrimination and does not refer to these claims in this order.

because they represent an exaggerated response to the State's objectives of supervision and rehabilitation. (ECF No. 65.)

Finally, Washington has filed a Motion for Disclosure, which Defendants oppose, seeking the contact information for several current and former TCCC employees who he says will attest to the motive and plan of Defendants' actions against him. (ECF Nos. 59, 62-63.)

## II. Discussion & Analysis

1. Summary Judgment Standard

"Summary judgment must be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Trammell v. Fruge*, 868 F.3d 332, 338 (5th Cir. 2017) (quoting FED. R. CIV. P. 56(a)). The court "'view[s] the facts in the light most favorable to the non-moving party and draw all reasonable inferences in the its favor.'" *Hanks* v. *Rogers*, 853 F.3d 738, 743 (5th Cir. 2017) (quoting *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009)).

Both movants and non-movants bear burdens of proof in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The movant with the burden of proof at trial must establish every essential element of its claim or affirmative defense. *Id.* at 322. The moving party without the burden of proof need only point to the absence of evidence on an essential element of the non-movant's claims or affirmative defenses. *Id.* at 323-24. At that point, the burden shifts to the non-moving party to "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The non-moving party cannot rely on general allegations but must produce "specific facts" showing a genuine issue for trial. *Tubacex v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

In deciding whether to grant summary judgment, "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon the evidence before the court." *See id.* (citation omitted).

2. Challenges to the TCCO Policies

Washington argues two TCCO policies, the Client Marriages Policy and the Healthy Relationships Policy, violate his constitutional rights to marriage, freedom of association, substantive due process, and equal protection. The Client Marriages Policy lists the guidelines and procedure for when SVPs or "clients" wish to marry another person. The policy distinguishes between SVPs living in the community, and SVPs residing at the TCCC, like Washington. For TCCC clients, the policy states as follows:

> III. Texas Civil Commitment Center Clients
>   A. Resident Request to Marry
>     1. A Texas Civil Commitment Center (TCCC) client who wishes to marry shall submit a request to the client's Case Manager and treatment provider at least sixty (60) days in advance of the proposed marriage.
>     2. The request to marry shall state the name of the proposed spouse, the spouse's birth date, and the date of the proposed wedding.
>     3. The Case Manager shall notify the Civil Commitment Manager upon receipt of the request. The Civil Commitment Manager shall notify the Deputy Director. The Case Manager shall review the request within three business days.
>     4. TCCO shall not deny a client the right to enter into a lawful marriage. However, TCCO shall ensure that the client has completed all prerequisites as set forth in this policy. ·
>
>   B. Case Manager Review
>     1. Upon receipt of a request to marry, the Case Manager shall review the client's profile in the case management database to determine:
>       a. Whether the client is single;
>       b. Whether the proposed spouse is a victim of the client;
>       c. Whether the proposed spouse has been approved as a chaperone; and

        d.  The proposed spouse's last date of fingerprint criminal history record check.

2. If client is listed as being married, the Case Manager shall review the client's file and profile in the case management database to determine whether there is indication of a divorce or of the previous spouse's death. If the Case Manager is unable to confirm that the client is single after reviewing the client profile, the Case Manager shall request further documentation from the client.

3. If the proposed spouse is a victim of the client, the Case Manager shall staff the issue with the Civil Commitment Manager for consideration of further action pursuant to Section 841.085 of the Health and Safety Code.

4. If the proposed spouse has been previously denied as a chaperone or collateral contact, the Case Manager shall staff the issue with the Civil Commitment Manager to review the reasons for denial and reconsider approval of the spouse in accordance with TCCO policy.

5. The Case Manager shall sign off on the client's request to marry if the following criteria are met:
    a.  The client is single;
    b.  The proposed spouse is not a victim of the client; and
    c.  The proposed spouse is an approved chaperone.

(ECF No. 28-1 at 5-6.) After the Case Manager approves a client's marriage request, both the treatment provider and the facility administrator must also approve the request. (*Id.* at 6-7.)

The Healthy Relationships Policy is aimed at "support[ing] and encourag[ing] clients to develop healthy relationships, which may include romantic relationships, to support and help the client successfully integrate into society. A romantic relationship, like all other contacts, requires prior approval in accordance with TCCO Policy 3.4, Approval of Contacts and Chaperones." (*Id.* at 9.) The Healthy Relationships Policy lists the steps a client must go through to enter into a TCCO-sanctioned relationship, and specifically excludes the following persons as partners:

V. Persons Who are Not Allowed to be Partners
    A potential partner shall not be approved to have a relationship with a client if the person:
    A.  Is an inmate, or on community, parole, or federal supervision, on civil commitment, or has pending criminal charges;
    B.  Is on deferred adjudication or has a prior conviction for a sex offense or an offense against a person, including Burglary with Intent to Commit an Offense Against a Person;

C. Exhibits traits, attitudes, or a personal history that would harm the client's success in completing civil commitment;

D. Is a victim of abuse, neglect, or sexual exploitation by the client; or

E. Is incapable of making informed decisions due to cognitive or intellectual impairments, mental health problems, or substance abuse problems.

(*Id.* at 11-12.)

### a. Right to Marry and Freedom of Association

In his complaint, Washington argues that, taken together, these TCCO policies violate his First Amendment right to freedom of association and his Fourteenth Amendment right to marry. Washington further argues that the Healthy Relationships Policy prohibits Washington from being in a relationship with the person of his choice because Layton is both a civil-committee and someone with a prior sex offense conviction.

"Over time and in other contexts, the [U.S. Supreme] Court has reiterated that the right to marry is fundamental under the Due Process Clause." *Obergefell v. Hodges*, 576 U.S. 644, 664 (2015). In *Turner v. Safley*, the Supreme Court held that there remained "a constitutionally protected marital relationship in the prison context" but it was "subject to substantial restrictions as a result of incarceration." 482 U.S. 78, 95-96 (1987). And while the right to intimate association is not "altogether terminated by incarceration or is always irrelevant to claims made by prisoners," it remains "among the rights least compatible with incarceration" and therefore "[s]ome curtailment of that freedom must be expected in the prison context." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) (citations omitted).

Under *Turner*, courts look at four factors when evaluating the reasonableness of a prison regulation that restricts a prisoner's constitutional rights: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether an available alternative means of exercising the right remains open to the

prisoner; (3) the impact accommodating the right will have on other inmates, guards, and the allocation of prison resources; and (4) whether the presence of ready alternatives that accommodates the prisoner's rights at de minimis cost to the penological interests undermines the regulation's reasonableness. *Turner*, 482 U.S. at 89-91; *Overton*, 539 U.S. at 136. "The burden, moreover, is not on the State to prove the validity of prisoner regulations but on the prisoner to disprove it." *Id.* at 132. Only a policy whose relationship to the governmental objective is "so remote as to render the policy arbitrary or irrational" will be deemed unconstitutional. *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 861 (5th Cir. 2004) (citing *Turner*, 482 U.S. at 89-90).

As a civil committee, Washington is "'entitled to more considerate treatment and conditions of confinement'" than prisoners; however, "the Constitution nevertheless affords a state wide latitude in crafting a civil commitment scheme." *Brown v. Taylor*, 911 F.3d 235, 243 (5th Cir. 2018) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321-22 (1982)). In a recent unpublished per curiam opinion, the Fifth Circuit applied the *Turner* framework when analyzing an SVP's claim that a TCCO policy violated his First Amendment rights. *See Dunsmore v. McLane*, No. 21-50541, 2022 WL 3210681, at *1-2 (5th Cir. 2022) (unpublished per curiam). Other U.S. Courts of Appeals have also applied the *Turner* framework to claims brought by civil committees challenging commitment policies. *See Pesci v. Budz*, 730 F.3d 1291, 1298 (11th Cir. 2013) (applying *Turner* to civil committee's claims, with some modification); *Ahlers v. Rabinowitz*, 684 F.3d 53, 64-66 (2nd Cir. 2012) (applying *Turner* to civil committee's claim that his mail was censored); *Bailey v. Stover*, 766 F. App'x 399, 401 (7th Cir. 2019) (assuming *Turner* applies to civilly-committed detainee as it does to other civil detainees); *see also Heyers*

8

*v. United States Bureau of Prisons*, 984 F.3d 347, 356 (4th Cir. 2021) (applying *Turner* framework to civil detainee's claims).

Under *Turner*, the Court first looks at whether there is a valid, rational connection between the challenged policies and the governmental interest. Texas's civil commitment program for SVPs is aimed at the "twin goals of 'long-term supervision and treatment of sexually violent predators.'" *Brown*, 911 F.3d at 243 (citations omitted); *see also* TEX. HEALTH & SAFETY CODE ANN. § 841.001 ("[T]he legislature finds that a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state."). Accordingly, there should be a rational relationship between the TCCO policies and the state's interest in the long-term treatment and supervision of SVPs.

Janet Latham, a TCCO Sex Offender Program Specialist, attests that the objective of sex offender treatment is "to provide the SVP with the necessary tools to eventually be released to the community and live a productive life free from offending behavior." (ECF No. 60-1 at 4.) Latham states that "SVPs have demonstrated boundary issues and have a history of coercive and manipulative behaviors, which include committing sexually violent offenses against others. Because of this past behavior, it is important to approach establishing and developing a romantic relationship in an appropriate manner to ensure it is in the best interest of all involved and does not harm the SVP or the person with whom the client intends [to] develop a relationship with and that it will support the client's success in treatment." (*Id.*) Regarding the Healthy Relationships Policy, Latham attests a potential partner must be a currently approved chaperone and that in order to be approved as a chaperone:

> the person is fully vetted by the case manager and treatment provider to determine if they would be an appropriate chaperone to include review of the person's criminal history. A chaperone must be willing to hold the SVP accountable for their behavior and report rules violations and high-risk behavior(s). The

> chaperone must be able to not be intimidated by the SVP. Prior to approval, the potential chaperone must attend chaperone training to gain insight into criminal thinking distortions, dis-inhibitors, traits of sex offenders, and understand that sex offenders tend to be dishonest and manipulate others to gain access to victims. The potential chaperone is provided with full disclosure of the SVP sex offending behavior without minimization or justification as to why the crime occurred.

(*Id.* at 5.)

Finally, Latham attests that, "[w]hile in treatment, the client has not yet mastered the management of deviant impulses, fantasies, distorted thinking or controlling behavior to the extent that the client is prepared to not only engage in a healthy relationship but to serve as a chaperone for another SVP" and that relationships among SVPs in different treatment tiers "could result in a power imbalance . . . which could lead to unhealthy behaviors such as controlling and manipulative behaviors or overt or implicit coercion." (*Id.* at 5-6.)

Jessica Marsh, the TCCO Deputy Director, attests that the goal of the Client Marriages policy is "to define the steps to be taken when a SVP Client requests to get married with an eye toward ensuring that the marriage does not interfere with the client's treatment that the prospective spouse would be protected from any potential harm from the SVP Client through manipulation or coercive behaviors." (ECF No. 60-2 at 3.) She states three sex offender treatment providers were consulted during the drafting of the Healthy Relationships Policy. (*Id.* at 4.) She further attests that the criteria for potential partners listed in the Healthy Relationships Policy is meant to ensure that a potential partner is willing and able to support the SVP's treatment and hold the SVP accountable. (*Id*.)

According to Marsh, "[s]ex offender treatment providers have recommended that restrictions be in place to ensure that the client is able to focus on the treatment program and internalization of the concepts such as managing cognitive distortions, management of deviant sexual interests or fantasies, and learning how to meet needs in a healthy manner without

harming others. . . . The goal of [the TCCO policies] is to allow the client to continue to focus on the treatment program but to allow a relationship or marriage if the proposed spouse is able to be a healthy and supportive partner." (*Id.*)

Marsh further states that SVPs are not permitted to engage in relationships with one another not only because it could potentially disrupt their treatment but because this potential is intensified in a confined environment like the TCCC where "clients are at risk of engaging in manipulative or coercive behavior." (*Id.*) She describes an incident where two clients who had a history of an unapproved relationship "were in a physical altercation over a jealousy issue"; another incident where a client committed the felony of taking off his GPS monitor after his unapproved relationship ended; and notes that clients have requested protection from each other after ending a relationship. (*Id.* at 4-5.)

As Washington points out, Ms. Latham is not a licensed sex offender treatment provider. (ECF No. 65 at 14). Rather, she has spent much of her career working as a parole officer and sex offender program specialist in the Texas Department of Criminal Justice (TDCJ), until she retired in 2014. In 2015, Ms. Latham began working at the TCCO as a Sex Offender Program Specialist, where she evaluates program processes and assists in the development of policies, the training of case managers, and the compliance review of contract services. (ECF No. 60-1 at 1-2.) Ms. Marsh is also not a sex offender treatment provider. She was the TCCO's General Counsel in 2014 before becoming the Deputy Director in 2020.

Although neither Ms. Latham nor Ms. Marsh are treatment providers, the Court nonetheless must "accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."

11

*Overton*, 539 U.S. at 132. Ms. Latham attests that "[w]hen talking to the professionals in the field of working with and treating sex offenders, there is a broad agreement, that it is not healthy for sex offenders, especially sex offenders currently participating in the same treatment program to engage in romantic relationships with each other." (ECF No. 60-1 at 5.) Further, Ms. Marsh attests that "[s]ex offender treatment providers have recommended that restrictions be in place to ensure that the client is able to focus on the treatment program and internalization of concepts such as managing cognitive distortions, management of deviant sexual interests or fantasies, and learning how to meet needs in a health manner without harming others." (ECF No. 60-2 at 4.)

The Court concludes that the summary judgment evidence shows a valid, rational, connection between the TCCO policies and Texas's goals of supervision and treatment of SVPs. As Ms. Latham states, SVPs are civilly committed because they have a history of documented behavioral problems, including sexually violent and coercive behavior. Both Latham and Marsh attested to a variety of reasons why allowing SVPs to marry or be in relationships with one another would undermine the TCCO's goals of providing effective treatment and supervision. Further, Latham and Marsh attested that sex offender treatment providers were consulted during the drafting of the TCCO policies, and that treatment providers broadly agree it is unhealthy for SVPs to be in relationships with one another while in civil commitment.

While the right to marriage is fundamental under the Due Process Clause, it is also a right the Supreme Court has held can be subject to substantial restrictions due to incarceration. Although Washington is not incarcerated and is entitled to more considerate treatment and conditions of confinement than prisoners, he and other SVPs present a unique set of issues for state officials attempting to supervise them and treat their behavioral abnormalities, while also

crafting policies that grant SVPs the constitutional protections to which they are entitled. The Court concludes that the TCCO policies are a rational response to these considerations.

Regarding the second *Turner* factor, the TCCO and MTC Defendants concede there are no alternatives means for Washington to exercise his right to marry Layton.

Turning to the third *Turner* factor, the defendants argue the accommodation of Washington's request would have a significant impact on other SVPs residing at TCCC, as well as on TCCC guards and facility resources. The TCCO Defendants argue that allowing two SVPs to marry one another would be "disruptive to the operation of the facility and treatment." (ECF No. 60 at 7.) As noted above, Ms. Marsh attests there are currently unauthorized SVP relationships at the TCCC and these relationships "have led to problems among the client population" which "disrupt the operations of the facility and are not conducive to sex offender treatment." (ECF No. 60-2 at 4-5.) The disruptions cited by Marsh include a physical altercation, an SVP committing a felony after an unapproved relationship ended and returning to prison, and clients asking for protection from one another after ending a relationship.

John Powell, TCCC Assistant Facility Administrator, attests that relationships among TCCC residents "might lead to the breakdown of order in the facility" and "jealousy among current and/or former partners could create disruption and/or lead to violence." (ECF No. 61-1 at 3.). Mr. Powell further attests that relationships among residents would require additional security resources so that staff could "monitor physical contact more closely in order to prevent sexual abuse and/or assault. Staff would have to discern whether certain contact was intentional and desired or if the contact or interaction is the result of duress, intimidation, or threat. The staff would necessarily be required to prevent, intervene, and/or discipline any instance of sexual abuse, requiring a coordinated effort between security, mental health, and health services staff."

(*Id.* at 4.) Finally, Mr. Powell attests it would be difficult for resident couples to room together because the TCCC has a limited number of "two-man" rooms. (*Id.*)

In response, Washington argues the security concerns cited by defendants are similar to the concerns expressed by the prison superintendent in *Turner*, i.e., that "love triangles" could lead to violent confrontations, and further, marriage to another inmate would not further the institutional goal of female prisoners concentrating on the development of self-reliance skills. *Turner*, 482 U.S. at 97. In finding the marriage regulation facially invalid, the Supreme Court concluded that nothing in the record suggested the marriage regulation was seen as preventing love triangles; the Court also concluded that the rehabilitative goal of self-reliance was itself suspect and noted the district court's finding that the prison in question operated on the basis of excessive paternalism. *Id.* at 98-99.

Defendants have articulated legitimate security concerns at TCCC with regard to relationships among residential SVPs. The Court is not unsympathetic to Washington's argument that defendants' security concerns mirror the *Turner* prison superintendent's worries about "love triangles" that the Supreme Court found unavailing. Even with the TCCO policies being enforced, Ms. Marsh identifies several security incidents arising from unapproved relationships. And while Mr. Powell attests that allowing relationships among SVPs could lead to the breakdown of order in the facility and require greater security resources, he provides no evidence to support this conclusion outside of his own speculation.

Nonetheless, the population in *Turner* differs in meaningful ways from the TCCC population: the prisoners in *Turner* were a mix of female and male prisoners convicted of a variety of crimes, while the SVPs at the TCCC are convicted sex offenders whom the state has found have a continuing behavioral abnormality requiring further treatment. Thus, in this

particular context, the Court is persuaded by the defendants' argument that approved relationships and marriages among SVPs could lead to institutional disruption and disarray.

Finally, *Turner*'s last factor considers whether the presence of ready alternatives which accommodate the prisoner's rights at de minimis cost to the penological interests undermine a regulation's reasonableness. Defendants argue there is no easy and obvious alternative means to accommodating Washington's request because, as Mr. Powell attests, unauthorized relationships have been disruptive at the TCCC and permitting marriage among SVPs could cause other SVPs married to people outside the facility to become jealous and noncooperative in treatment. (ECF No. 60 at 8.) Washington argues that the jealousy issues works both ways: SVPs who are not allowed to marry and have no way of meeting potential partners outside of the facility could become jealous of those SVPs who are married, thereby also interfering with treatment.

Based on the nature of Washington's challenge, it does not appear there is an alternative to marriage or an approved relationship that would accommodate his rights.

Upon consideration of the four *Turner* factors, the evidence before the Court supports the existence of a reasonable relationship between the TCCO policies and Texas's twin goals of supervision and treatment for SVPs. Ms. Latham and Ms. Marsh's affidavits support a rational relationship between the TCCO policies and the twin goals, and the Court is persuaded that accommodating Washington's right to marry Layton would lead to additional security concerns and institutional disruption at the TCCC. Accordingly, Washington has not met his burden of disproving the validity of the TCCO policies by showing that the relationship between the TCCO policies and Texas twin goals of supervision and treatment is "so remote as to render the polic[ies] arbitrary or irrational" *Freeman*, 369 F.3d at 861.

*b. Substantive Due Process*

Washington also argues that the TCCO policies violate his substantive due process rights by "(1) imposing punitive conditions of confinement on the plaintiff due to being in a romantic relationship, as well as a complete ban on his romantic relationship and marriage to Layton; (2) by not offering less restrictive alternatives; (3) by having unconstitutional policies in place which infringe upon the plaintiff's civil liberties when exercised by the plaintiff, which resulted in punitive treatment . . .; and (4) Confiscation of Expressive clothing and destroying property package of $557.00" (ECF No. 65 at 6.)

A government violates substantive due process when it deprives an individual of constitutional rights by an arbitrary use of its power. *Simi Inv. Co. v. Harris Cnty.*, 236 F.3d 240, 249 (5th Cir. 2000). Here, Washington does not claim that Defendants' actions were arbitrary but that the policies supporting their actions are unconstitutional. Accordingly, Washington has failed to allege that Defendants' actions were an arbitrary use of power and therefore his substantive due-process claim fails as a matter of law.

*c. Equal Protection*

Finally, Washington argues these policies violate his right to equal protection under the Fourteenth Amendment. The Fourteenth Amendment's Equal Protection Clause commands that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To maintain a claim for an equal protection violation, Washington must allege and prove purposeful discrimination by the defendants resulting in a discriminatory effect among persons similarly situated. *See Muhammad v. Lynaugh*, 966 F.2d 901, 903 (5th Cir. 1992). The fact that the Client Marriages and Healthy Relationship polices adversely impact Washington's ability to pursue a relationship

with Layton does not, by itself, establish a violation of the Equal Protection Clause. "[D]isparate impact alone cannot suffice to state an Equal Protection violation; otherwise, *any* law could be challenged on Equal Protection grounds by whomever it has negatively impacted." *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997) (citation omitted) (emphasis in original). Discriminatory purpose in an equal protection context implies the decision maker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable group. *Johnson*, 110 F.3d at 306.

Washington initially alleged the TCCO policies discriminated against gay and transgender TCCC clients but then abandoned this argument in his supplemental pleadings. It is thus unclear on what basis he believes these policies violate his right to equal protection. To the extent Washington claims he is a "class of one," he must still show that (1) he was intentionally treated differently from others similarly situated, and (2) there was no rational basis for the difference in treatment. *Rountree v. Dyson*, 892 F.3d 681 n.10 (5th Cir 2018) (citing *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012)). However, because he fails to show that he was treated differently from others similarly situated, i.e., other TCCC clients who also desire to be in romantic relationships or marry TCCC clients, this claim fails as a matter of law.

3. Retaliation

Washington's remaining claim is that the MTC Defendants harassed and retaliated against him due to his relationship with Layton. Specifically, Washington alleges that the MTC Defendants intentionally kept him and Layton apart from one another; they had Washington fired from his job in June 2020; they withheld a $557 package from Washington; and they forced him to remove a Black Lives Matter t-shirt and would not allow him to wear pink. He further alleges the MTC Defendants confiscated his legal research and then punished him with a thirty-day

dorm restriction and six-month package restriction. (ECF No. 1.) The MTC Defendants moved for summary judgment, arguing they were enforcing TCCO policies, not retaliating or harassing Washington. (ECF No. 40.) In Washington's pleadings opposing summary judgment, he restates his complaint allegations, alleging the MTC Defendants singled him out for prosecution and harassment, and further alleges that Defendant Arenivaz began willfully abusing him in January 2020; his Juneteenth and Black Lives Matter t-shirts were taken from him; he was punished for passing a document to Layton via another client; and all the incident reports he received were an attempt to dissuade him from filing lawsuits. (ECF Nos. 43, 49, 51.)

The summary judgment evidence shows the following. In January 2020, Washington's case manager asked Washington about Layton, noting Layton had reported that they were in a relationship, and Washington responded they had an "emotional relationship" but conceded they had hugged, and Layton had kissed him. He also reported that he was not homosexual. (ECF No. 40-2 at 30.) On June 21, 2020, Washington received an incident report, from Sergeant Brittany Vejar, who stated she had seen Washington and Layton kissing in the breezeway, which was a violation of MTC Level 2 Rule 20.0: Sexual Misconduct. (*Id.* at 69, 78.) In the preliminary investigation, Washington denied kissing Layton, stating he was walking the breezeway. J. Wellman, the investigating officer, stated Washington was clearly seen on camera kissing Layton. J. Heaton, the Director of Security, signed off on the investigation. (*Id.* at 79-80.) Two days later Washington discussed the kissing incident with his case manager, saying "if that officer had taken 30 seconds to walk over to the door she would have seen that nothing happened" and that he was simply trying to comfort Layton. His case manager told him that, if the accusations were true, Washington would likely not advance in tier. Washington claimed he was being targeted. (*Id.* at 34.)

In the morning of July 2, 2020, Washington received another incident report for a violation Level 2 Rule 20.3: Engaging in Consensual Sexual Acts with Others. Captain Victoria Rodriguez reported that Layton had informed Defendant Beltran that Layton and Washington were acting out sexually. When Captain Rodriguez confronted Washington about Layton's statement, Washington admitted that, in the blind spot of a building, he had pulled down Layton's pants and then rubbed his penis on Layton's buttocks; he stopped for fear of getting in trouble. (*Id.* at 69, 82.) Defendant Arenivaz presented the formal allegations to Washington. (*Id.* at 83.) In Layton's witness statement, Layton stated that these sexual acts had happened three times between March and June, 2020. (*Id.* at 84.)

On July 9, 2020, a three-person Behavioral Management Committee held a Behavioral Management Review (BMR) hearing on both incidents. Regarding the kissing incident, Washington admitted to kissing Layton, stating Layton was "going through stuff" and Washington thought a hug and kiss would comfort Layton. Washington also admitted to the sexual acts incident, stating he and Layton had been in a relationship for half a year and Washington wanted to keep their relationship healthy. The committee found Washington guilty on both counts and sanctioned him with thirty days of unit restriction along with sixty days of community service. Rachel Kingston was the only defendant on the BMR committee. (*Id.* at 81).

Washington filed a grievance in August 2020, complaining about a package he had to send back to his mother; he sought more time to return the package so his mother would have sufficient funds to pay for the return fee. In response, the grievance investigator stated Washington had been put on package restriction on June 21, 2020, after receiving a disciplinary, and then had received an incident report on July 2, and July 5, 2020. (*Id.* at 47.)

On September 29, 2020, Washington received another incident report for a violation of Level 2 Rule 27.0: Out of Place. The laundry manager reported she had seen Washington and Layton standing very close to one another outside of a camera's view. When she asked Washington what he was doing, he said he was waiting for group to start, but group had not been called. (*Id.* at 70, 88, 91.) Defendant Arenivaz conducted the preliminary investigation and Washington stated he was on break from group, waiting to speak with a Captain, when Layton walked over to say "hi" and Washington noticed Layton was limping. (*Id.* at 89.) Defendants Arenivaz and Winckler reviewed the incident report and preliminary investigation and referred Washington to a BMR. (*Id.* at 90.) There is no record of what occurred at the BMR hearing.

On March 17, 2021, Washington met with Defendant Beltran and Case Manager Higgins to discuss his relationship with Layton. Washington told Beltran and Higgins that he had spoken to an attorney who reported that "TCCO does not have a say so if two clients can be in a relationship." Beltran reported that there was nothing she could do concerning the policy and that Washington will have to "wait for the courts to settle it out." Beltran told Washington that Layton only wanted to be friends with Washington, but Washington responded that Layton was saying that for fear of being demoted. Washington stated he used to cook food and pass it to Layton through other clients but stopped after Beltran told Layton this was against the rules. Beltran reminded Washington that clients were only able to give items to other clients if the facility first cleared it. Higgins additionally noted that Washington was working on a lawsuit challenging TCCO's Healthy Relationships Policy; Higgins and Beltran explained they would follow TCCO policy in the event it was changed. Finally, Higgins reminded Washington that, based on current COVID rules, Washington and Layton could not have contact with each other because they were in separate dorms. (*Id.* at 41.)

On March 30, 2021, Washington received an incident report for a violation of Level 2 Rule 30.0: Soliciting Assistance from a SVP Client, Staff Member, or Any Other Person to Violate TCCO, TCCC, or Employee Rules. According to the reporting employee, Washington attempted to pass legal documents to Layton via another TCCC client, Kevin Allen, but Layton turned the documents in, wanting nothing to do with them. Defendant Arenivaz conducted the preliminary investigation; Washington refused to make a statement. Layton gave a witness statement, stating the document was about marriage, and that Layton had no knowledge of the document and did not want to receive it. Arenivaz signed Layton's statement. Winckler referred Washington to a BMR. (*Id.* at 70, 93-99.)

The BMR hearing was held on April 7, 2021. Washington pleaded "no contest" and stated he was not aware he was violating a rule. The BMR committee, which included Winckler, found Washington guilty and gave him thirty days of dorm restriction and six months of package restriction. (*Id.* at 100.)

Washington filed a Step 1 grievance regarding the BMR hearing on April 14, 2021, arguing he should not have been found guilty because TCCO Policy 3.21 states he can confer with another resident concerning legal matters, and that it was not clear what rule he had broken by sending the legal documents to Layton. Washington complained that the resident he gave the documents to received only a verbal reprimand whereas Washington received a six-month package restriction. In response, the grievance officer stated Washington had violated COVID protocols which were placed in his dorm for his review. (*Id.* at 101-02.) Washington filed a Step 2 grievance on May 14, 2021, arguing the COVID protocols referred to by the grievance officer were not posted in his dorm, and that he believed he was being retaliated against for threatening to file a lawsuit and being discriminated against based on his sexual orientation. The grievance

officer denied the appeal, stating there was no evidence the enforcement of rules was retaliatory or discriminatory. The grievance officer also noted that the receiving party rejected the documents, which contradicted Washington's claim he and Layton were consulting on legal matters. (*Id.*at 103-04.)

In an affidavit, Winckler attested he was the Chief of Security at TCCC and that his job was to enforce TCCO and MTC's policies at TCCC. He stated Washington's request to marry or be in a physical relationship with Layton was prohibited by TCCO policies, and that he had no role in approval of a resident's relationship partners. He further attested that he did not recall ever confiscating a Black Lives Matter t-shirt from Washington or prohibiting him from wearing pink; the TCCC COVID protocols did not allow residents from different dorms to interact with one another; and Washington and Layton had never been housed in the same dorm. Finally, Winckler stated that the resident who passed the legal materials from Washington to Layton was also sanctioned. (*Id.* at 1-2.)

In a separate affidavit, Arenivaz attested he was the Assistant Shift Supervisor at TCCC, and that, like Winckler, he had no authority to approve a resident's relationship partners. Arenivaz attested that, because of his rank, he is aware of all resident movement at TCCC and that Washington made multiple attempts to interact with Layton in violation of TCCO policies and the COVID protocols. Arenivaz stated he would keep Washington and Layton apart during these attempts. He finally attested that he did not recall confiscating a Black Lives Matter t-shirt from Washington. (*Id.* at 3-4.)

Washington attached several affidavits to his Opposition, all of which were signed under penalty of perjury pursuant to 28 U.S.C. § 1746. Layton attested to entering into a relationship with Washington in November 2019 and reporting the relationship sometime in December 2019.

Layton further stated that, after the kissing incident in June 2020, Layton reported other sex acts to Defendant Beltran, Layton's case manager, and that after this "Defendants, . . . insinuated and outright told me that 'I would not be able to progress in therapy' or 'My progression in this program would be delayed' if I was in a romantic relationship" with Washington. Layton attested these statements made Layton "terrified and scared of what they may do" and, as a result, Layton ended the relationship with Washington. Layton has recently reconciled with Washington and wishes to marry him. (ECF No. 43-1 at 38-39.)

Another TCCC resident, Rodney Rhynes, attested he lived with Washington for almost two years and witnessed numerous instances of Arenivaz harassing Washington "to the point of depression, tears, and suicidal contemplation." He states Washington's room was searched three to four times a week, as opposed to monthly searches for other residents, and it only happened when Arenivaz was working. He further attested Arenivaz was "determined" to keep Washington and Layton apart and that Rhynes had two relationships MTC and TCCO were aware of, but that he was never harassed and threatened like Washington. (*Id.* at 40-41.)

Jorge Graza attested that he "always saw Mr. Arenivaz making a point to mess with [Washington and Layton]. He didn't want them sitting close together, talking to each other, or even [Washington] doing [Layton's] hair." (*Id.* at 42.) Ernesto Cerda attested that Arenivaz and Winckler were constantly harassing Washington. (*Id.* at 43.) Finally, Arthur Jackson III attested that Arenivaz went out of his way to harass Layton. (*Id.* at 44.)

"Under the First Amendment, a prison official may not harass or retaliate against an inmate 'for exercising the right of access to the courts, or for complaining to a supervisor about a guard's misconduct.'" *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019). The elements of a retaliation claim are "(1) a specific constitutional right; (2) the defendant's intent to retaliate

against the prisoner for his or her exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999). The plaintiff must establish that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). Mere conclusory statements that retaliation occurred are not sufficient; rather, "the inmate must produce direct evidence of motivation or, . . . 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Id*.

Washington alleges the MTC Defendants retaliated against him when he began pursuing a relationship with Layton. He states the MTC Defendants harassed him, took away his Black Lives Matter t-shirt and legal research, did not allow him to purchase anything pink, and then imposed upon him a thirty-day dorm and six-month package restriction. However, Washington fails to show that he was exercising a constitutional right when any of these actions took place. The summary judgment evidence shows that Washington was sanctioned based on his violation of MTC rules against sexual misconduct, consensual sexual acts with others, being out of place, and soliciting assistance from another TCCC client to violate TCCO rules, yet Washington does not challenge any of these rules as unconstitutional. Further, the affidavits Washington submitted in his Opposition, while generally supporting his allegation that the MTC Defendants worked to keep him and Layton away from one another, nonetheless fail to show that any of the sanctions Washington suffered arose from his exercise of constitutional rights. Washington seems to imply that, because he believes the TCCO policies are unconstitutional, that his discipline based on violations of MTC rules is likewise unconstitutional. But even if the TCCO policies were unconstitutional, this does not mean that the MTC rules are also unconstitutional. As a result,

there is no genuine issue of material fact on Washington's retaliation claim, and the MTC Defendants are entitled to summary judgement.

4. Pending Motion

In Washington's pending Motion for Disclosure, he seeks the last known address and phone numbers for several individuals who he alleges can attest to the "motive, opportunity, plan, and knowledge of the defendant[s'] actions against and towards the plaintiff(s)" and how the MTC Defendants targeted and retaliated against Washington with "bogus write-ups and sanctions." (ECF No. 59.) The Court has concluded that the MTC Defendants are entitled to summary judgment because Washington failed to show he was retaliated against for exercising a constitutional right. Because this motion seeks further discovery related to Washington's meritless retaliation claim, it is denied.

### III. Conclusion

It is therefore **ORDERED** that Defendants' Motions for Summary Judgment (ECF Nos. 28, 40) are **GRANTED**; and

It is finally **ORDERED** Washington's Motion for Disclosure (ECF No. 59) is **DENIED**.

SIGNED this 17th day of March, 2023.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE